UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

JACQUELINE G. CASTINER,           )
                                  )
                Plaintiff,        )
                                  )
        v.                        )        No. 2:10 CV 17 DDN
                                  )
MICHAEL J. ASTRUE,                )
Commissioner of Social Security,  )
                                  )
                Defendant.        )

## MEMORANDUM

This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
application of plaintiff Jacqueline G. Castiner for disability insurance
benefits (DIB) under Title II of the Social Security Act, and
supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C.
§ 401, et seq.  The parties have consented to the exercise of plenary
authority by the undersigned United States Magistrate Judge pursuant to
28 U.S.C. § 636(c).  (Doc. 11.)  For the reasons set forth below, the
court concludes that the ALJ's decision must be remanded.

## I.  BACKGROUND

Plaintiff Jacqueline G. Castiner was born on August 22, 1979.  (Tr.
205.)  She is 5'6" tall with a weight that has ranged from 149 pounds to
190 pounds.  (Tr. 27, 248.)  She is single and lives with her ten year-
old son.  (Tr. 25-26.)  Castiner completed high school and began
technical school for training as an Emergency Medical Technician (EMT),
but did not complete the program. (Tr. 26-27.)  She last worked at
Commercial Envelope Manufacturing Co., Inc. in February 2007, packing
envelopes.  (Tr. 122.)

On February 27, 2007, Castiner applied for DIB and SSI, alleging an
onset date of February 13, 2007.  (Tr. 1, 108-14, 115-20.)  She received
a notice of disapproved claims on April 16, 2007.  (Tr. 60-64.)  After
an evidentiary hearing on August 19, 2009, the ALJ denied benefits on
September 10, 2009. (Tr. 20-56, 7-19.)  On January 8, 2010, the Appeals

Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1-3.)

## II. MEDICAL HISTORY

On October 25, 2006, Castiner was admitted on a voluntary basis to a Missouri Department of Mental Health facility to receive aid for her mental health issues. (Tr. 243.) She stated that the treatment facility "helps [her] with dealing with [her] mental health and having the extra support when [she] need[s] it the most." (Id.) She was diagnosed with schizoaffective disorder and bipolar disorder, and assigned a GAF score of 55.[1] (Id.)

On February 13, 2007, Castiner was hospitalized at Northeast Regional Medical Center after an attempted suicide, which caused lacerations to her right neck and right forearm. (Tr. 212.) Charles Zeman, D.O., performed her procedures and repaired the lacerations. (Tr. 232.) Dr. Zeman prescribed Abilify, Albuterol, Combivent, Prozac, Risperdal, and Topamax.[2] (Tr. 212.)

---

[1]A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function. A GAF score has two components. The first component covers symptom severity and the second component covers functioning. A patient's GAF score represents the worst of the two components. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

On the GAF scale, a score from 51 to 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

[2]Abilify is used to treat certain mental/mood disorders (such as bipolar disorder, schizophrenia). It may also be used in combination with other medication to treat depression. It works by helping to restore the balance of certain natural chemicals in the brain (neurotransmitters). Albuterol is used to prevent and treat wheezing and shortness of breath caused by breathing problems (e.g., asthma, chronic obstructive pulmonary disease). It is also used to prevent asthma brought on by exercise. It works in the airways by opening breathing passages and relaxing muscles. Combivent is a combination of Albulteral
(continued...)

On February 15, 2007, she was transferred involuntarily from Northeast Regional Medical Center to a Missouri Department of Mental Health facility because of her suicide attempt. (Tr. 212m 236.) She had superficial lacerations on her right forearm and a laceration on the right side of her neck, which were closed with sutures. (Tr. 237.) She tested positive for benzodiazepine and opiates. (Tr. 230.) She stated that she ceased using drugs for well over 18 months. (Tr. 236.) She began feeling anxious and slightly depressed two weeks prior to this hospitalization. (Id.) She attempted suicide because she was afraid she might relapse on drugs. (Id.) At the facility, her mood gradually improved and her symptoms of depression decreased. (Tr. 237.) She became social with staff and peers and was an active participant in treatment groups. (Id.) She was discharged on February 22, 2007 and was prescribed Prozac and Topamax. (Id.) She was assigned a GAF score of 40-55 upon discharge.[3] (Id.)

---

[2](...continued)
and Ipratropium.  It is used to treat or prevent wheezing and shortness of breath caused by ongoing breathing problems (e.g., chronic obstructive pulmonary disease-COPD, emphysema, chronic bronchitis).  It works in the airways by opening breathing passages and relaxing muscles.

Prozac is used to treat depression, panic attacks, obsessive compulsive disorder, a certain eating disorder (bulimia), and a severe form of premenstrual syndrome (premenstrual dysphoric disorder).  Risperdal is used to treat certain mental/mood disorders (such as schizophrenia, manic phase of bipolar disorder, irritability associated with autistic disorder).  This medication can help the patient think clearly and function in daily life.  Topamax is used alone or with other medications to prevent and control seizures (epilepsy).  It is also used to prevent migraine headaches and decrease their frequency.  WebMD, http://www.webmd.com/drugs/ (last visited March 4, 2011).

[3]A GAF of 31 through 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work).  A score of 31 represents worse than serious symptoms.  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning
(continued...)

Castiner was admitted in a rehabilitation program at Preferred Family Healthcare on October 27, 2005 (Tr. 241.) In her treatment, Castiner participated in medication services, community support work, vocational services, substance abuse services, and individual counseling. (Tr. 242.) It was noted that she was compliant with treatment, had her own residence and two jobs, but needed to work on socialization. (<u>Id.</u>) She was diagnosed with schizoaffective disorder, bipolar disorder, methamphetamine abuse, and attention-deficit/hyperactivity disorder (ADHD). (<u>Id.</u>) She was discharged from the program on February 27, 2007, and assigned a GAF score of 45, although her highest score in the previous year was 56. (<u>Id.</u>)

Starting in February 2007, Gerald G. Osborn, D.O., M. Phil., a psychiatrist consultant, first examined Castiner. (Tr. 267.) On February 28, 2007, Dr. Osborn noted that Castiner reported auditory and visual hallucinations. (Tr. 267-68.) Dr. Osborn diagnosed her with schizoaffective disorder and substance abuse in recent remission. (Tr. 268.) She was assigned GAF scores of 35-40 and 40-45 for the past year. (<u>Id.</u>)

On March 12, 2007, Castiner was seen by Dr. Osborn on the urgent request of her psychotherapist, Donna Peissner, M.A. (Tr. 265.) Castiner reported an increase in auditory hallucinations and paranoid ideation. (<u>Id.</u>) She also reported the reemergence of a "secret friend," which she called Mitch. (<u>Id.</u>) Castiner completed a PHQ-9 with a score of 18/3.[4] (<u>Id.</u>) Dr. Osborn prescribed Haloperidol.[5] (Tr. 266.) On

---

[3](...continued)
(e.g., no friends, unable to keep a job). American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 32-34 (4th ed. 2000).

[4]PHQ-9 is the nine item depression scale of the Patient Health Questionnaire. The PHQ-9 is a tool for assessing primary care clinicians in diagnosing depression as well as selecting and monitoring treatment. <u>Luckett v. Astrue</u>, Civil No. 09-5211, 2011 WL 336250, *3 (W.D. Ark. Jan. 31, 2011).

On the PHQ-9 score scale, a score of 15-19 represents moderate symptoms. The second score of 3 represents extreme difficulty doing work, taking care of things at home, or getting along with others. The recommended treatment is active treatment with medication or
(continued...)

March 21, 2007, Dr. Osborn noted that Castiner reported significant improvement but still experienced some anxiety and had difficulty concentrating. (Tr. 264.)

On April 16, 2007, Michael Stacy, Ph.D., completed a psychiatric review and mental residual functional capacity assessment of Castiner for Social Security purposes. (Tr. 272-86.) In the psychiatric review, Dr. Stacy opined that Castiner's impairments were severe but not expected to last 12 months. (Tr. 272.) Castiner's impairments included organic mental disorders, affective disorders, anxiety-related disorders, personality disorders, substance addiction disorders, and ADHD. (Tr. 272-73, 277.) Dr. Stacy opined that, with continued treatment, Castiner's condition would be expected to improve further. (Tr. 282.) In the mental residual functional capacity (RFC) assessment, Dr. Stacy evaluated Castiner's ability to sustain various mental activities over a normal workday and workweek on an ongoing basis. (Tr. 284.)

Dr. Stacy opined that Castiner was "Not Significantly Limited" in her ability to: (i) remember locations and work-like procedures; (ii) understand and remember very short and simple instructions; (iii) carry out very short and simple instructions; (iv) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (v) sustain an ordinary routine without special supervision; (vi) make simple work-related decisions; (vii) interact appropriately with the general public; (viii) ask simple questions or request assistance; (ix) get along with coworkers or peers without distracting them; (x) maintain socially appropriate behavior; (xi) respond appropriately to changes in the work setting; (xii) be aware or normal hazards and take appropriate precautions; and (xiii) set realistic goals. (Tr. 284-85.) Dr. Stacy opined that Castiner was "Moderately Limited"

[4](...continued)
psychotherapy.
http://www.mainehealth.org/workfiles/mh_healthinformation/PHQ9.pdf (last visited Mar. 4, 2011).

[5]Haloperidal is used to treat certain mental/mood disorders (e.g., schizophrenia, schizoaffective disorders). It helps the patient think more clearly, feel less nervous, and take part in everyday life. WebMD, http://www.webmd.com/drugs/ (last visited March 4, 2011).

in her ability to: (i) understand and remember detailed instructions; (ii) carry out detailed instructions; (iii) maintain attention and concentration for extended periods; (iv) work in coordination with or proximity to others without being distracted by them; (v) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (vi) accept instructions and respond appropriately to criticism from supervisors; and (vii) set realistic goals or make plans independently of others. (Id.)

On June 29, 2007, Dr. Osborn met with Castiner and noted that she was friendly, cooperative, and more relaxed in the interview. (Tr. 325.) She completed a PHQ-9 with a score of 2/1.[6] (Id.) On July 31, 2007, Dr. Osborn noted that Castiner was friendly and cooperative during her interview, but "[h]er demeanor continue[d] to be somewhat anxious and fidgety." (Tr. 327.) She completed a PHQ-9 with a score of 4/1. (Id.) On October 3, 2007, Dr. Osborn noted that Castiner's mood was upbeat, although she had anxious mannerisms including bouncing her knee up and down while she talked. (Tr. 329.) She completed a PHQ-9 with a score of 4/2.[7] (Id.)

On May 29, 2008, Dr. Osborn completed a mental assessment regarding Castiner's ability to do work-related activities. (Tr. 296.) On this form, Dr. Osborn checked various blocks representing Castiner's ability to adjust to a job. (Id.) Dr. Osborn indicated that Castiner had "Good" ability to follow work rules. (Id.) He opined that Castiner had "Fair" ability to: related to co-workers, deal with the public, use judgment, and interact with supervisor(s). (Id.) He further noted that her ability was "Poor or None" to deal with stresses, function independently, and maintain attention. (Id.) Dr. Osborn opined that Castiner had

_____

[6]A PHQ-9 score of 0-4 represents no depression. The second score of 1 represents it being somewhat difficult to do work, take care of things at home, or get along with other people. The recommended treatment is to consider other diagnoses. http://www.mainehealth.org/workfiles/mh_healthinformation/PHQ9.pdf (last visited Mar. 4, 2011).

[7]The second score of 2 represents it being very difficult to do work, take care of things at home, or get along with other people.

serious psychiatric illness, had achieved a fragile stability, and continued to experience both auditory and visual hallucinations. (Id.) He noted that the likelihood of her being able to sustain simple, repetitive work on a competitive basis was extremely low. (Tr. 296)

On May 30, 2008, Castiner visited Dr. Osborn because she felt depressed and irritable. (Tr. 342.) Dr. Osborn noted that she appeared more anxious than usual, but her thought processes and cognitive functioning were completely intact. (Id.) She completed a PHQ-9 with a score of 16/3. (Id.) On June 3, 2008, Dr. Osborn noted that Castiner's demeanor was more calm, relaxed, and engaging than her visit on May 30, 2008. (Tr. 331.) Her thought processes were intact and she denied auditory hallucinations. (Id.) She completed a PHQ-9 with a score of 10/2.[8] (Id.) On June 4, 2008, Castiner called Dr. Osborn and reported that her paranoia and auditory hallucinations were worsening. (Tr. 333.)

On July 14, 2008, Castiner underwent a psychological/clinical assessment at Preferred Family Healthcare. (Tr. 379-84.) It was noted that she was insightful to her problems and her judgment seemed fair. (Tr. 379.) She was cooperative, friendly, and open during the interview. (Tr. 380.) Her goals were to stabilize her mental illness, learn to cope with schizoaffective disorder, and maintain her independent living. (Tr. 383.) Barriers to these goals were low self-esteem, isolation, medical issues, and reoccurrences with her mental health symptoms. (Id.) She was assigned a GAF score of 50. (Tr. 381.)

On November 4, 2008, Castiner was admitted to Hannibal Regional Hospital due to hallucinations and suicidal thoughts. (Tr. 351.) She was initially treated with Zyprexa, Lamictal, Cymbalta, Adderall, and Valium.[9] (Id.) Her GAF score was 21 upon admission.[10] (Tr. 362.)

---

[8]A PHQ-9 score of 10-14 represents mild symptoms. The recommended treatment is to consider watchful waiting and, if active treatment is needed, medication or psychotherapy is equally effective. http://www.mainehealth.org/workfiles/mh_healthinformation/PHQ9.pdf (last visited Mar. 4, 2011).

[9]Lamictal is used alone or with other medications to prevent and control seizures. It may also be used to help prevent the extreme mood
(continued...)

Castiner responded well to treatment and was discharged on November 10, 2008 with a GAF score of 65.[11] (Id.) At the time of discharge, she was alert and denied any hallucinations. (Tr. 352.)

In February 2008, Castiner began seeing Ms. Peissner on a consistent basis for treatment. (Tr. 386.) Ms. Peissner's progress notes from February 12, 2008 to June 23, 2009 outline Castiner's progress. (Tr. 386-407.) On February 12, 2008, Ms. Peissner assessed Castiner a GAF score of 35-40 and a 40-45 in the past year. (Tr. 386.) On June 17, 2008, Ms. Peissner noted that Castiner demonstrated some type of routine for her daily living and began to show some limited social functioning, as well as initiating some contact with others. (Tr. 387.) As the sessions progressed, Ms. Peissner noted that Castiner began to feel more comfortable with herself and continued to make progress, although her symptoms were still present. (Tr. 391, 395-96, 400.) On March, 31, 2009, Ms. Peissner noted that Castiner's PHQ-9 score was 0/1. (Tr. 399.)

Ms. Peissner's clinical records dated June 10, 2008 to September 16, 2008 indicate that Castiner's anxiety and irritability persisted. (Tr. 408-18.) On September 16, 2008, her GAF score was 31-40 and 41-50 in the prior year. (Tr. 415.)

_____

[9](...continued)
swings of bipolar disorder in adults. Valium is used to treat anxiety, acute alcohol withdrawal, and seizures. It is also used to relieve muscle spasms and to provide sedation before medical procedures. WebMD, http://www.webmd.com/drugs/ (last visited March 4, 2011).

[10]A GAF of 21 to 30 indicates "[b]ehavior is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment . . . or inability to function in almost all areas." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

[11]A GAF of 61-70 represents mild symptoms (such as depressed mood and mild insomnia), or some difficulty in social, occupational, or school functioning (such as occasional truancy, or theft within the household), but the individual generally functions pretty well and has some meaningful interpersonal relationships. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000).

On August 4, 2009, Ms. Peissner completed a mental assessment regarding Castiner's ability to do work-related activities. (Tr. 451.) Ms. Peissner indicated that Castiner had "Good" ability to function independently. (Id.) She opined that Castiner had "Fair" ability to: follow work rules, relate to co-workers, deal with the public, use judgment, and interact with supervisor(s). (Id.) She further noted that her ability was "Poor or None" to deal with work stresses. (Id.)

**Testimony at the Hearing**

On August 19, 2009, Castiner testified at a hearing before the ALJ. (Tr. 25-45.) She testified that she was 29 years old at the time and was not married. (Tr. 25-26.) She lived in a two level apartment with her son, who was ten years old. (Tr. 26.) She earned her high school diploma and attempted technical school for EMT training but did not complete the program. (Tr. 26-27.) She made it through the physical portion of the school's training, but did not take the state boards portion. (Tr. 27.) She can read and do simple arithmetic. (Id.) Her income at the time included a TANEF check and either $274 or $294 in food stamps. (Tr. 28.) She served time in jail for a Class C and D felony for possession of methamphetamine and paraphernalia in 2005. (Id.)

She testified that she last worked in February 2006 or 2007. (Tr. 29.) She quit her employment with Burger King in January, where she worked as an assistant manager. (Tr. 29-30.) At Burger King her duties included paperwork, cashier work, kitchen duties, cooking, cleaning, customer service, and managing shifts. (Id.) She had the ability to hire and fire people as an assistant manager. (Tr. 30.) She spent ten and a half years in various employment positions with Burger King. (Id.)

Castiner quit her employment with Commercial Envelopes in February 2006 or 2007 because she could not handle the stress and chaos of the position. (Tr. 29.) She spent six months at the company, packing envelopes. (Tr. 30.) Her only other employment in the previous 15 years was at Ortech in August 2003 or 2004. (Tr. 30, 32.) She worked there for a month, putting together small car parts. (Tr. 30-31.) She quit Ortech due to the frequent drug activity occurring among employees. (Tr. 31.)

Castiner was diagnosed with schizoaffective and bipolar disorder, meaning she heard voices and hallucinated. (Tr. 32.) The voices frequently told her to hurt people or herself and were demeaning and belittling. (Tr. 33.) She took medication for the voices, which helped but did not completely stop them. (Id.) She worked for a number of years with the voices while taking her medication, but she would stop taking her medication out of frustration when it quit working. (Tr. 33-34.) She first started seeing a psychiatrist in 2001, whom she saw for a couple of years. (Tr. 34.) She saw another psychiatrist in February 2007. (Id.)

Castiner began using drugs at age 14, which only included marijuana. (Tr. 35.) At age 17, she began taking heroin. (Id.) At age 18, she began using methamphetamine, which she used off and on until 2000. (Tr. 35-36.) She stopped using drugs from 2000 to 2003. (Tr. 36.) She relapsed and began taking drugs off and on from 2003 to 2005, and was arrested for drugs in 2005. (Id.) She testified that she last used drugs on August 28, 2005. (Id.)

In February 2007, Castiner attempted suicide and tested positive for opiates and benzodiazepine, which she said were prescribed to her. (Id.) She testified that it was not a suicide attempt but, rather, she was tricked by the voices in her head. (Tr. 27.) They pretended to be God and she believe she was doing what God wanted her to do. (Id.)

She testified that she has no physical limitations. (Id.) Her medications included Zyprexa, Cymbalta, Topamax, Adderall, Imitrex, Haldol, and Xanax.[12] (Tr. 37-38.) She recently tried to participate in

---

[12]Zyprexa is used to treat certain mental/mood conditions (such as schizophrenia, bipolar mania). It may also be used in combination with other medication to treat depression. It works by helping restore the balance of certain natural chemicals in the brain (neurotransmitters). Cymbalta is used to treat depression and anxiety. It is also used to help relieve nerve pain (peripheral neuropathy) in people with diabetes or ongoing pain due to medical conditions such as arthritis, chronic back pain, or fibromyalgia (a condition that causes widespread pain). Adderall is a combination medicine used as a part of a total treatment program to control attention deficit hyperactivity disorder (ADHD). It may help to increase the ability to pay attention, stay focused, and control behavior problems.

(continued...)

volunteer work, but quit because there were too many people and too much congestion.  (Tr. 38.)

Castiner sometimes cooks and cleans for her son.  (Tr. 39.)  On her disability application, she noted that she used to wake up her son, get him ready for school, make dinner, dust, vacuum, do laundry and dishes, shop for clothes and food, play on the Play Station and internet, and do some four wheeling.  (<u>Id.</u>)  Castiner testified that she no longer mowed the lawn and her friend helps her with many of the other tasks.  (<u>Id.</u>)  She no longer gets on the internet, but still plays Play Station, cooks, drives, and does dishes and laundry.  (Tr. 39-40.)  She usually sends a friend or relative to the grocery store with a list.  (Tr. 41.)

Castiner testified that a normal day for her consists of waking up, making coffee, and starting her routine.  (<u>Id.</u>)  She will start laundry, unload the dishwasher, and wake up her son.  (<u>Id.</u>)  She then takes a nap, watches television, and attempts to finish her laundry.  (<u>Id.</u>)  Her son then gets home from school and she will help with his homework, feed him dinner, and then go to bed.  (Tr. 42.)

Castiner testified that her condition prevents her from working because she feels overwhelmed in large settings.  (<u>Id.</u>)  She tried a factory setting where she was around one other person, but it was too much for her.  (Tr. 42-43.)  She does not feel comfortable leaving her apartment and is a paranoid person.  (Tr. 42.)  Castiner feels comfortable going to her sister's house for dinner.  (Tr. 43.)

---

[12](...continued)
Imitrex is used to treat migraines.  It helps to relieve headaches, pain and other symptoms of migraines, including sensitivity to light/sound, nausea, and vomiting.  Haldol is used to treat certain mental/mood disorders (e.g., schizophrenia, schizoaffective disorders). It helps the patient think more clearly, feel less nervous, and take part in everyday life.  It can also help prevent suicide in people who are likely to harm themselves.  It also reduces aggression and the desire to hurt others.  It can decrease negative thoughts and hallucinations. Xanax is used to treat anxiety and panic disorders.  It belongs to a class of medications called benzodiazepines which act on the brain and nerves (central nervous system) to produce a calming effect.  It works by enhancing the effects of a certain natural chemical in the body (GABA).  WebMD, <u>http://www.webmd.com/drugs/</u> (last visited March 4, 2011).

She only leaves her apartment to go to her mom's or sister's residence. (Tr. 44.) She has two friends, but does not go out with them. (Id.) While employed at Burger King, Castiner was close friends and roommates with the manager. (Tr. 44-45.)

Castiner's attorney then examined Castiner. (Tr. 45.) During the examination, Castiner testified that her friend helps her with daily chores three to four time a week because she cannot do them herself. (Tr. 45, 47.) She needs assistance with her son because she often feels scared and does not want him to feel alone. (Tr. 46.) Her medication sometimes makes it difficult for her to get out of bed in the morning. (Tr. 47.)

Castiner testified that she no longer has suicidal thoughts and she sleeps better, but still has difficulty with her focus and hears voices. (Tr. 48.) She has crying spells and also manic modes where she is overly excited. (Tr. 49.) She is paranoid about other people and felt that they are out to get her. (Id.)

**Testimony of the Vocational Expert**

Vocational expert (VE) Gary Weemholt also testified at the hearing. (Tr. 49-54.) The first hypothetical assumed a person with Castiner's education, training, and work experience. It further assumed the person has no exertional limitations and has the ability to: perform repetitive work concerning set procedure, sequence or pace; maintain regular attendance and work presence without special supervision; and perform some complex tasks. (Tr. 52.) Based on the aforementioned, the VE testified that the hypothetical person could perform all past work. (Id.)

A second hypothetical by the ALJ changed only the mental limitations of the person. (Tr. 52.) It assumed the person would be able to: understand, remember, and carry out at least simple instructions, non-detailed tasks; demonstrate adequate judgment to make simple, work related decisions; respond appropriately to supervisors and co-workers in a task oriented setting where contact with others is casual and infrequent; and adapt to routine and simple work changes. (Tr. 52-53.) Based on the aforementioned, the VE testified that the hypothetical

person could perform past work at Ortech, but not the fast food assistant managerial work. (Tr. 53) This person could also perform one of the approximately 7,500 cleaning jobs defined under code 323.687-014. (<u>Id.</u>)

A third hypothetical by the ALJ changed another mental limitation of the person. (<u>Id.</u>) It assumed the person would be able to: maintain concentration and attention for two hour segments over an eight hour period; demonstrate adequate judgment to make simple work related decisions; work in jobs which have limited contact with supervisors and/or co-workers; and adapt to routine, simple work changes. (<u>Id.</u>) Based on the aforementioned, the VE testified that the hypothetical person would be to perform the same jobs as the person in hypothetical two. (Tr. 54.)

A fourth hypothetical by the ALJ was the same as hypothetical three, except the person could have up to four absences per month because of mental episodes which would prevent her from getting to work on time or at all. (<u>Id.</u>) Based on the aforementioned, the VE testified that this would not be consistent with on-going work if it was a chronic condition. (<u>Id.</u>) If the person was unable to maintain concentration for two hour segments over an eight hour period that would also not be consistent with on-going work. (<u>Id.</u>)

A fifth hypothetical by Castiner's attorney assumed the person had poor or no ability to deal with work stresses. Based on this, the VE testified that the hypothetical person would not be able to perform past relevant work or any other jobs previously mentioned by the VE. (<u>Id.</u>)


<h2 style="text-align:center"><u>III. DECISION OF THE ALJ</u></h2>

On September 10, 2009, the ALJ entered an unfavorable decision. (Tr. 7-19). The ALJ found Castiner had the following severe combination of impairments: schizoaffective disorder, personality disorder, and ADHD. (Tr. 12). The ALJ found that Castiner did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments under the Act. (<u>Id.</u>) The ALJ found that Castiner can: understand, remember, and carry out at least simple instructions and

non-detailed tasks; maintain concentration and attention for two hour segments over an eight hour period; demonstrate adequate judgment to make simple work related decisions; work in jobs which have limited contact with supervisors or coworkers; and adapt to routine/simple work changes. (Tr. 14.)  The ALJ found that Castiner can perform her past relevant work. (Tr. 18.)  Consequently, the ALJ found Castiner was not disabled as defined under the Act. (Tr. 19.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed

impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  Id.  The claimant bears the burden of demonstrating she is no longer able to return to her past relevant work.  Id.  If the Commissioner determines the claimant cannot return to past relevant work, the burden shifts to the Commissioner at step Five to show the claimant retains the RFC to perform other work.  Id.


## V.  DISCUSSION

Castiner contends the ALJ erred in failing to give proper weight to Dr. Osborn's May 2008 assessment and Ms. Peissner's August 2009 assessment.  Specifically, Castiner argues that (1) Dr. Osborn and Ms. Peissner's opinions should have been given controlling weight; (2) Dr. Stacy's opinion was given too much weight; and (3) the ALJ substituted his own opinion rather than relying on the opinions of Dr. Osborn and Ms. Peissner.  Castiner also argues that the ALJ erred in omitting several key GAF scores from the hearing decision.

## A. Treating Physician Dr. Osborn's opinion and Ms. Peissner's opinion

Castiner argues the ALJ erred in failing to give controlling weight to Dr. Osborn's May 2008 opinion that there is a low likelihood of her being able to sustain simple repetitive work on a regular basis. Castiner also argues that the ALJ erred in failing to give controlling weight to Ms. Peissner's August 2009 opinion that Castiner has "poor or none" ability to deal with work stresses.

The ALJ noted that Dr. Osborn and Ms. Peissner completed assessments indicating that Castiner's ability to work is compromised, but opined:

> [T]hose assessments are not consistent with [Castiner's] good condition on discharge from her hospitalizations, and her working for years with her impairments and the additional severely limiting impairment of substance abuse.  Those assessments are based on what the claimant tells those source[s] and inconsistencies in this record as a whole . . . detract from the claimant's allegations of completely disabling symptoms and limitations.  The [ALJ] agrees with the

treating sources that the claimant's ability to work is limited. However considering the evidence as a whole they have overstated her vocational dysfunction.

(Tr. 18.)

**1. Controlling weight to Dr. Osborn's and Ms. Peissner's opinions**

The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence in the record. 20 C.F.R. § 404.1527(d)(2). A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it. <u>Davidson v. Astrue</u>, 578 F.3d 838, 842 (8th Cir. 2009). <u>See</u> 20 C.F.R. § 404.1527(d)(2). An ALJ may elect under certain circumstances not to give controlling weight to a treating doctor's opinions. "A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability." <u>Travis v. Astrue</u>, 477 F.3d 1037, 1041 (8th Cir. 2007). "If the doctor's opinion is inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight." <u>Id.</u>; <u>see also</u> <u>Hacker v. Barnhart</u>, 459 F.3d 934, 937 (8th Cir. 2006); 20 C.F.R. § 404.1527(d)(2). "It is the ALJ's duty to resolve conflicts in the evidence." <u>Travis</u>, 477 F.3d at 1041.

In this case, the limitations set forth by Dr. Osborn are inconsistent with and unsupported by the medical evidence of record, including his own treatment notes. For example, in March 2007, Dr. Osborn noted that Castiner reported "significant improvement" regarding her mental health. (Tr. 264.) In December 2007, Dr. Osborn noted that Castiner was friendly and cooperative during their entire session. (Tr. 290.) In January 2008, he noted that Castiner reported her depression was easing due to her change in medication. (Tr. 292.) In April 2008, Dr. Osborn opined that she was calmer, experiencing no hallucinations, less anxious, more social, and "appeared much improved." (Tr. 294.)

Similarly, the limitations set forth by Ms. Peissner are inconsistent with and unsupported by the medical evidence of record, including her own treatment notes. For example, in June 2008, Ms. Peissner noted that Castiner "demonstrate[d] some type of routine for her

- 16 -

daily living," and "seemed fully oriented, [and] could adequately attend and concentrate." (Tr. 387, 389.) In July 2008, Ms. Peissner noted that Castiner "[was] beginning to feel more comfortable with herself and able to make some decisions on her own." (Tr. 391.) In July 2008, she noted that Castiner's "mood and affect were bright and her hygiene much improved." (Tr. 392-93.) In January 2009, Ms. Peissner noted that Castiner was making progress. In March 2009, she noted that Castiner was "alert, clear, and her speech was goal-directed" and she has kept a daily routine, including joining a gym. (Tr. 396, 398.) In April 2009, Ms. Peissner noted that she "continue[d] to use her support system." (Tr. 400.) In May 2009, Ms. Peissner noted that Castiner "[was] using some healthy communication by talking with her family." (Tr. 403.) In June 2009, Ms. Peissner noted that Castiner was "working her recovery program," "[was] not feeling the urge to use any substances," and "seem[ed] to be doing quite well right now." (Tr. 405-06.)

Dr. Osborn's and Ms. Peissner's assessments are also inconsistent with Castiner's good condition on discharge from her hospitalizations. At the Missouri Department of Mental Health facility, her mood gradually improved and her symptoms of depression decreased. (Tr. 237.) She became social with staff and peers and was an active participant in treatment groups. (Id.) Castiner was discharged on February 22, 2007 and was prescribed Prozac and Topamax. (Id.) She was discharged from Hannibal Regional Hospital on November 10, 2008. (Tr. 351.) At the time of discharge her condition was "significantly improved." (Id.) Castiner had no side effects and was tolerating the medication well. (Id.) She had positive future plans and stated that she would comply with her medication regimen and was committed to following her aftercare plan. (Tr. 352.) Her GAF score was 65. (Id.)

Dr. Osborn's and Ms. Peissner's assessments are also inconsistent with Castiner working for years with her impairments. Castiner stated in the ALJ hearing that she worked for years with her impairments while taking medication. (Tr. 33.) She would stop taking her medication when she got frustrated. (Tr. 33-34.) See Bryant v. Astrue, No. 4:07 CV 802 ERW, 2008 WL 3896024, *10 (E.D. Mo. 2008 Aug. 18, 2008) ("Inasmuch as plaintiff worked with her impairment during this period and no evidence

in the record showed plaintiff's condition to have deteriorated, the ALJ properly relied on plaintiff's work record to support his finding that plaintiff's subjective complaints were not credible.")

Dr. Osborn does not provide objective medical evidence supporting the work-related limitations imposed by him. (Tr. 296.) The extreme limitations assessed by Dr. Osborn are based on Castiner's subjective complaints, which the ALJ found not fully credible, rather than on objective medical evidence. See Wildman v. Astrue, 596 F.3d 959, 967 (8th Cir. 2010). Therefore, the ALJ did not err in affording Dr. Osborn's assessment little weight.

Further, Castiner completed a PHQ-9 assessment in March 2009 and was asked whether she has been bothered by the following problems: little interest in doing things, feeling depressing, trouble sleeping, feeling tired, poor appetite, feeling bad about yourself, trouble concentrating, moving or speaking slowly, thoughts of suicide. (Tr. 399.) She checked "Not at all" for every question. (Id.)

## 2. Dr. Stacy's opinion

Castiner argues that the ALJ improperly gave "great weight" to Dr. Stacy's opinion. The undersigned disagrees.

Dr. Stacy, the State Agency consultant psychologist, reviewed Castiner's file in April 2007 and opined that:

> The evidence shows that with continued medical compliance and with abstaining from DAA the claimant will have the ability within 12 months of onset to understand, carry out, and remember simple instructions using judgment; respond appropriately to supervisors, co-workers, and usual work situations; and be able to deal with changes in a routine work setting.

(Tr. 286.)

The ALJ's decision does not support Castiner's contention that the ALJ gave "great weight" to Dr. Stacy's opinion. (Tr. 17-18.) Rather, the ALJ noted Dr. Stacy's opinion was consistent with other criteria within the record that support his decision. (Tr. 18.)

## 3. ALJ's opinion

Castiner argues the ALJ substituted his opinion for the opinions of Dr. Osborn and Ms. Peissner.  The undersigned disagrees.

Initial determinations of fact and credibility are the domain of the ALJ.  Jones v. Chater, 65 F.3d 102, 104 (8th Cir. 1995).  Where crucial to the opinion, these determinations must be set out in the decision, and must be set out with sufficient specificity to enable a reviewing court to decide whether substantial evidence supports the determination.  Taylor ex rel. McKinnies v. Barnhart, 333 F. Supp. 2d 846, 856 (E.D. Mo. 2004).

Here, the ALJ's decision was supported by substantial evidence where testimony and the decision, itself, noted that Castiner could shop, clean, care for her son, and did not have any concern with her daily living skills.  (Tr. 17.)

The ALJ did not substitute his opinion for the opinions of Dr. Osborn and Ms. Peissner, but rather exercised his authority when weighing the evidence before him.  See 20 CFR §§ 404.1527(d), 416.927(d).  While the formulation of RFC is a medical question, Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000), it is based on all the relevant, credible evidence of record including the medical records, observations of treating physicians and others, and an individual's own description of limitations.  See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000).  Looking at the ALJ's opinion, the ALJ discounted the unfavorable evidence while relying on the favorable evidence.  See Richardson v. Astrue, No. 2:07 CV 17 DDN, 2008 WL 3982064, at *3 (E.D. Mo. Aug. 22, 2008).  The ALJ recognized that Dr. Osborn and Ms. Peissner indicated that Castiner's mental ability to work is compromised, but he provided reasons for discounting such evidence.  (Tr. 18.)  As the ALJ stated:

> [T]hose assessments are not consistent with her good condition on discharge from her hospitalizations, and her working for years with her impairments and the additional severely limiting impairment of substance abuse.  Those assessments are based on what the claimant tells those source[s] and inconsistencies in this record as a whole . . . detract from the claimant's allegations of completely disabling symptoms and limitations.

(Id.)

Thus, the ALJ adequately described his reasons for discounting Dr. Osborn's and Ms. Peissner's opinions and did not improperly substitute his opinion for their opinions.

Castiner also argues that if ALJ believed that the treating sources' notes and opinions were of no value, the ALJ was obligated to re-contact the treating sources for additional evidence or clarification. "A social security hearing is a non-adversarial proceeding, and the ALJ has a duty to fully develop the record." Smith v. Barnhart, 435 F.3d 926, 930 (8th Cir. 2006). That duty includes a duty to contact a treating physician for clarification of an opinion, but "only if the available evidence does not provide an adequate basis for determining the merits of the disability claim." Sultan v. Barnhart, 368 F.3d 857, 863 (8th Cir. 2004). Put another way, the ALJ's duty to contact a treating physician for clarification is triggered when "a crucial issue is undeveloped." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). See also 20 C.F.R. § 404.1512(e). For example, if the treating physician's report "contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques," then the ALJ must contact the treating physician for clarification. 20 C.F.R. § 404.1512(e)(1). See also Goff v. Barnhart, 421 F.3d 785, 791 (8th Cir. 2005). However, the ALJ need not contact a treating physician whose opinion is "inherently contradictory or unreliable." Hacker, 459 F.3d at 938.

Here, the ALJ did not find Dr. Osborn's or Ms. Peissner's records inadequate, unclear, or incomplete, nor did it find that a crucial issue was undeveloped. Instead, the ALJ discounted the opinions because they were inconsistent with other substantial evidence. In such cases, an ALJ may discount an opinion without justification. Goff, 421 F.3d at 791.

## B. GAF Scores

A GAF score is a determination based on a scale of 1 to 100 of a "clinician's judgment of the individual's overall level of functioning." Hudson ex rel. Jones v. Barnhart, 345 F.3d 661, 662 n.2 (8th Cir. 2003). The Eighth Circuit has noted that a GAF score between 41 and 50 "reflects

serious limitations in the patient's general ability to perform basic tasks of daily life . . ." Brueggemann v. Barnhart, 348 F.3d 689, 695 (8th Cir. 2003).  A GAF score of 51 to 60 is "indicative of 'moderate symptoms' or 'moderate difficulty in social, occupational, or school functioning.' " Lacroix v. Barnhart, 465 F.3d 881, 883 (8th Cir. 2006). In Pate-Fires, the Eight Circuit held that the claimant's history of GAF scores of 50 or below demonstrated the claimant had serious impairment in occupational or social functioning.  Pate-Fires, 564 F.3d at 944.

Here, Castiner's GAF scores from October 2006 to September 2008 ranged from 21 to 65.  Such scores represent "serious" and "moderate" symptoms which affected her ability to perform basic tasks of daily life and cause difficulty in social and occupational functioning.  See LaCroix, 465 F.3d at 883; Brueggemann, 348 F.3d at 695.  The court bears in mind that the ALJ has a duty to develop the record fully and fairly. Cox v. Astrue, 495 F.3d 614, 618 (8th Cir. 2007); Sneed v. Barnhart, 360 F.3d 834, 838 (8th Cir. 2004).

In the case at bar, the ALJ refers only to Castiner's highest GAF score, 65, which was assigned to her upon discharge from the hospital. Yet, the ALJ fails to discuss Castiner's GAF scores of 55, 40-55, 45, 35-40, 21, 35-40, 31-40, 50. (Tr. 243, 237, 241, 268, 362, 386, 415, 381.) These GAF scores spanned over a two year period and were contrary to the ALJ's findings, and indicate serious symptoms affecting Castiner's level of functioning.  The Eighth Circuit has recognized that GAF scores of 50 or less reflect "a serious limitation on a claimants ability to perform basic life tasks" and often preclude the ability to work.  Pate-Fires, 564 F.3d at 944; Escardille v. Barnhart, No. CIV.A. 02-2930, 2003 WL 21499999, *6 (E.D. Pa. June 24, 2003) ("[T]he ALJ must give some indication of the [GAF scores] which he rejects and the reason[s] for discounting such evidence.").

Because the ALJ failed to address or consider the totality of Castiner's GAF scores from October 2006 to September 2008, the court finds that the ALJ failed to fully and fairly develop the record with regard to Castiner's mental impairments.  See Zwack v. Astrue, No. C09-0120, 2010 WL 2160870, *11 (N.D. Iowa May, 27, 2010).  Therefore, remand is necessary.  See Pate-Fires, 564 F.3d at 944.

## VI.  CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is reversed and remanded.  On remand, the ALJ shall the reconsider the residual functional capacity of plaintiff resulting from her mental impairments in light of all of the GAF scores in the record and the reasons for the scores.  The ALJ shall specifically describe his consideration of this material.  An appropriate Judgment Order is issued herewith.


                              /S/    David D. Noce
                              **UNITED STATES MAGISTRATE JUDGE**


Signed on March 15, 2011.